UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MEGHANN KNICKERBOCKER, et al., | CASE NO. C12-1142JLR |
| Plaintiffs, | ORDER AWARDING SANCTIONS |
| v. | |
| CORINTHIAN COLLEGES, et al., | |
| Defendants. | |

## I.   INTRODUCTION

Before the court are Plaintiffs' first and second motions for sanctions against Defendant Corinthian Colleges, Inc. ("Corinthian").  (1st Mot. (Dkt. # 37); 2d Mot. (Dkt. # 63).)  Plaintiffs argue that Corinthian's failure to preserve and subsequent delay in producing evidence merits sanctions.  (*See id*.)  Having considered the submissions of the parties, the balance of the record, and the relevant law, and having heard oral argument and received supplemental briefing, the court GRANTS Plaintiffs' motions.

ORDER- 1

## II.    BACKGROUND

Corinthian runs for-profit colleges throughout the United States and Canada.  (1st Mot. at 2.)  Plaintiffs Janet O'Connell, Lisa Holland, and Meghann Knickerbocker, former employees of Corinthian, filed this action against Corinthian for racial discrimination, harassment, and retaliation in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, and Washington state law.  (*See* 2d Am. Compl. (Dkt. # 29).)  Plaintiffs allege that they were subjected to racially hostile work environments and discrimination at the hands of Corinthian employees, including Sheila Austin, Lisa Cook, Jenna Rygol, and Meredyth Givens.  (*Id.*)  Plaintiffs allege that this discrimination culminated in termination of their respective employments in late April, 2012.  (*Id.*)

Corinthian received Notices of Charge of Discrimination from the Equal Employment Opportunity Commission ("EEOC") for Ms. Holland and Ms. Knickerbocker shortly after their termination in early May, 2012.  (Hainley Decl. (Dkt. # 39-11) ¶¶ 4, 6, 7.)  Corinthian received a demand letter from Plaintiffs on May 29, 2012.  (Demand Let. (Dkt. # 39-2)).  Corinthian's legal department contacted outside counsel, Payne & Fears LLP ("Payne and Fears"); Mr. Alejandro Ruiz of Payne & Fears began handling the matter in June 2012.  (*See* Ruiz Decl. (Dkt. # 39-1) ¶ 7.)  Plaintiffs filed this action on July 3, 2012.  (Compl. (Dkt. # 1).)

In January, 2013, Plaintiffs' counsel expressed concern about Corinthian's meager document production; multiple discovery conferences and correspondence between

1  Plaintiffs' counsel and Mr. Ruiz followed.[1]  (*See* Burke Decl. (Dkt. # 21).)  In April or

2  May, 2013, Mr. Ruiz represented that Plaintiffs' work email accounts were deleted

3  shortly after Plaintiffs' termination.  (Martin Decl. (Dkt. # 38) ¶ 17; Burke Decl. ¶ 17.)

4  When questioned about backup sources, Mr. Ruiz represented that the information "could

5  not be extracted without shutting down the servers; in other words, it was not

6  extractable."  (Burke Decl. ¶ 17; *see also* Ruiz Decl. ¶ 17.)  This representation would

7  later prove to be inaccurate.  (*See* Brown Decl. (Dkt. # 72) ¶¶ 3, 8 (discussing emails

8  retrieved from the backup tapes).)

9          Plaintiffs filed a motion to compel responses to certain discovery requests.  (Dkt.

10  # 20.)  To resolve this motion, the parties stipulated to an order that the court signed on

11  June 3, 2013.  (Stip. Order (Dkt. # 24).)  Mr. Ruiz, on behalf of Corinthian, and Ms.

12  Margaret Enslow, on behalf of the Plaintiffs, jointly drafted this order.  (12/12/13 Trans.

13  (Dkt. # 62) at 22.)  This stipulated order required that, among other things:

14          Defendant, at its own expense, shall conduct a full and complete search for
        all documents responsive to Plaintiffs' Requests for Production Nos. 1, 2, 3,
15          4, 5, and 27, and such search shall include documents on backup servers.

16  (Stip. Order at 3.)  Corinthian only produced about 100 pages of additional

17  documents in response to this order.  (Martin Decl. ¶ 18.)  On July 1, 2013,

18  Defendant filed a "Verification of Compliance with Stipulation and Order

19  Compelling Further Discovery" which verified that:

20  _____

21          [1] Ms. Burke's declaration refers to Corinthian's counsel as "Alex Rodriguez."  (Burke Decl. ¶ 8.)
    After reviewing the remainder of the record, including correspondence attached to Ms. Burke's
22  declaration, the court infers that she intended to refer to defense counsel Mr. Alejandro Ruiz.  (*See, e.g.*,
    Ruiz Decl.)

ORDER- 3

1
2
3

   Corinthian, at its own expense, conducted a full and complete search for all documents responsive to Plaintiffs' Requests for Production Nos. 1, 2, 3, 4, 5, and 27 (subject to any and all objections and limitations previously agreed to by the parties) *on all available electronic sources and/or servers* . . . .

4 (Verification (Dkt. # 33) (emphasis added).)   This verification was incorrect in

5 that Corinthian's backup tapes were not searched, despite the fact that Plaintiffs

6 had not agreed that the backup tapes were not "available."   (12/12/13 Trans. at

7 29.)   The Verification was signed by Mr. Ruiz.   (*Id.*)

8   Nonetheless, as discovery continued, Plaintiffs grew increasingly concerned that

9 Defendant had not adequately preserved and collected documents.   (Martin Decl. ¶ 19.)

10 In July and August, 2013, various Corinthian employees testified that they had not

11 searched, did not recall searching, and had not been asked to search for documents

12 relevant to the litigation.   (*See* Martin Decl. Ex. E (Austin Dep.) at 3; *id.* Ex. F (Givens

13 Dep.) at 7; *id.* Ex. G (Cook Dep.) at 11; *id.* Ex. I (Phillips Dep.) at 12; *id.* Ex. J (Paulino

14 Dep.) at 16.)   Mr. Ruiz had assured Plaintiffs that a Rule 30(b)(6) deposition "would

15 better help [them] judge whether Corinthian has reasonable complied with [their]

16 requests."   (5/31/13 Ruiz Email (Dkt. # 38-3) at 19.)   Accordingly, Plaintiffs' Rule

17 30(b)(6) notice identified topics such as Defendant's "policies, procedures, and practices

18 related to . . . backup procedures for electronically stored information" and "[a]ny and all

19 searches Defendant conducted to find documents responsive to Plaintiffs' discovery

20 requests in the above-captioned litigation, including . . . the location where the documents

21 are physically or electronically stored . . .  and whether any documents could not be

22 searched or retrieved."   (30(b)(6) Notice (Dkt. # 38-4) ¶¶ 18, 21.)

1       Corinthian designated Stanley Banash, Senior Information Technology Director of

2 Information Security, to testify.  (*See* Banash Dep. (Dkt. # 38-5).)  At deposition, Mr.

3 Banash testified that Corinthian did not issue a litigation hold with respect to Plaintiffs'

4 action, and that, unless there was a litigation hold, Corinthian automatically deleted

5 terminated employees' email accounts 30 days after the employee's termination.  (*Id.* at

6 13, 15.)  Mr. Banash also testified that he was unaware of how to retrieve information

7 that was stored on Corinthian's backup system.  (*See id.* at 9-10 ("I don't run the backup

8 systems, so you've got to talk to somebody who does."))

9       On October 8, 2013, Plaintiffs brought their first motion for sanctions, arguing that

10 Corinthian's discovery tactics had resulted in spoliation of evidence and merited a default

11 judgment.  (*See generally* 1st Mot.)  At the time, Corinthian's total document production

12 totaled only 1,272 pages.  (Ruiz Decl. ¶ 11.)  In response, Corinthian asserted that its

13 document search was sufficient, that it had deleted Plaintiffs' email accounts before the

14 duty to preserve was triggered, and that Corinthian was not required to access the emails

15 retained on its backup tapes because the Stipulated Order only referred to backup

16 "servers," not backup "tapes," and retrieval of information on the backup tapes would

17 require "unreasonable" cost and effort.  (*See* 1st Resp. (Dkt. # 39); Ruiz Decl. ¶ 17.)

18       To support the second point, Corinthian relied on a declaration by Andrew

19 Ainsworth, Corporate Counsel for Corinthian, stating that it was not possible to

20 determine the date each email account was deleted, and that "a former employee's email

21 account may continue to be stored for up to 30 days before deletion occurs, but that the

22 number of days that elapse between the 'Account Termination Notification' and the

ORDER- 5

1    account's deletion can vary . . . ."  (Ainsworth Decl. (Dkt. # 39-6) ¶¶ 2, 7.)  However, Mr.

2    Ainsworth's claim that employee email accounts could be deleted anytime *within* 30 days

3    of a termination notification contradicted Mr. Banash's deposition testimony that the

4    accounts were deleted 30 days *after* the IT Department received and implemented a

5    termination notification.  (*See* Banash Dep. at 12-13.)  Notwithstanding Mr. Banash's

6    testimony, Corinthian argued that it could not be proven that Corinthian deleted

7    Plaintiffs' email accounts after the duty to preserve attached.  (*See* 1st  Resp. at 11-13.)

8         To address the factual discrepancies advanced by the parties, the court held oral

9    argument and heard testimony from Mr. Banash and Mr. Ainsworth.  (12/12/13 Min.

10   Entry (Dkt. # 48); *see generally* 12/12/13 Trans.)  At the hearing, Jeffrey Brown, counsel

11   for Corinthian, admitted that, although Corinthian had issued litigation holds in previous

12   litigations, Corinthian did not issue a litigation hold with respect to this case.  (12/12/13

13   Trans. at 4-5.)  Mr. Brown represented that, instead of issuing a company-wide notice,

14   Corinthian had hand-selected certain employees and requested that they retrieve and

15   retain relevant documents.  (*Id.* at 5-7, 12, 18.)

16        Mr. Banash testified as to the process by which terminated employees' email

17   accounts are automatically deleted.  (*Id.* at 9, 29-30.)  Specifically, within 24 hours of

18   receiving a termination notice from the Human Resources ("HR") Department, the IT

19   Department closes the terminated employee's email account and the account "goes into a

20   30-day holding pattern.  After 30 days the email system itself, the exchange system,

21   removes the box.  It simply recovers the disk space that it was taking up."  (*Id.* at 9; *see*

22   *also* 29-30.)  As to the timing of the deletion, Mr. Banash confirmed: "On the servers

ORDER- 6

1  [the emails] continue to exist for 30 days. After 30 days from the closure date, the

2  exchange server itself simply removes the box, deletes it." (*Id.* at 30.)

3       In light of this testimony, Mr. Ainsworth admitted that his declaration stating that

4  Corinthian deleted terminated employees' email accounts anytime *within* 30 days of

5  receipt of a notice from HR was incorrect. (*Id.* at 33.) Mr. Ainsworth admitted that he

6  had not talked to Mr. Banash prior to making his declaration, and that he "was not 100

7  percent sure" about the number of days at the time he made his declaration. (*Id.* at 32-

8  34.)

9       Corinthian's counsel, Mr. Brown, conceded that Plaintiffs' email boxes were in

10 fact deleted pursuant to this practice. (*Id.* at 26 ("With respect to the plaintiffs' email

11 boxes, no, your Honor.  Those emails exist on the backup tapes, but those email boxes

12 were deleted per the policy that Mr. Banash explained to you.")) Mr. Brown also

13 conceded that the deletion of Plaintiffs' emails occurred after Corinthian received

14 Plaintiffs' EEOC notices:

15       If you put an order in that says delete the mailbox in 30 days, should
         somebody have spotted the EEOC charges and made the connection and
16       gotten around and suspended that? That's something I can't argue.  That is
         something that we have looked at.  Yeah, we have to find a way to fix that
17       system, your Honor.  I cannot sit here and tell you that is the best way to do
         things.
18
         (*Id.* at 28.) [2]
19

20       _____

21       [2] Mr. Brown also explained that no other document destruction program was in place at
    Corinthian. (*Id.* at 7.)  Although Plaintiffs pointed to a Corinthian document purporting to establish a six-
22  month automatic email deletion policy, the policy was apparently never implemented. (*See* 1st Mot.)
    Plaintiffs claim that Mr. Ruiz represented that the reason Corinthian had produced so few emails was due

Mr. Brown and Mr. Banash maintained that all employee email accounts were preserved on Corinthian's backup tapes.  (*See id.* at 9, 15, 17, 18.)  Specifically, Mr. Brown averred that:

> First of all, there are backup tapes that have every single email that has been referred to on them.  Every single day that Corinthian has operated in Bremerton there are backup tapes with those e-mails.  Everything we are talking about in this motion has been preserved and is available.

(*Id.*at 17.)

Plaintiffs' counsel explained that they first learned of the backup tapes in May, 2013, at which time Mr. Ruiz represented that retrieving information from the tapes would require shutting down the system for 72 hours and would be prohibitively expensive.  (12/12/13 Trans. at 22-23 (testimony by David Martin); *see also* Ruiz Decl. ¶ 17 ("I explained that it was unreasonable and impractical to search them because retrieval of any information from those tapes would require dedicated servers to which the information would need to be downloaded (sequentially) and configured . . . .")) Because Mr. Banash had proven unable to address this topic during his 30(b)(6) deposition, Plaintiffs' counsel possessed little other knowledge regarding the backup tapes.  (12/12/13 Trans. at 31-32; *see also id* at 23.)

Mr. Brown took the position that the Stipulated Order's requirement for a "full and complete search" that "shall include documents on backup servers" did not extend to documents kept on backup tapes, because "[t]he tape is an entirely different ballgame

---

to the alleged six-month deletion policy (*see, e.g.*, Burke Decl. ¶ 17); Corinthian disputes that Mr. Ruiz ever made such a representation.

from the servers." (*Id.* at 20, 21-22; *see also id.* at 21 (testimony by Mr. Banash

confirming that Corinthian has both backup tapes and backup servers).)  Plaintiffs'

counsel, on the other hand, claimed that they were not aware that Corinthian intended to

draw a "distinction between backup servers and backup tapes," and that they understood

the Stipulated Order to refer "generally to backup media."  (*Id.* at 22, 24-25 (testimony by

Margaret Enslow).)  Similarly, with respect to the Verification of Compliance, which

affirmed that Corinthian had searched "all available electronic sources and/or servers,"

Plaintiffs maintained that they had not agreed that the backup tapes were not "available."

(*Id.* at 30 (testimony by Mr. Martin).)

     Mr. Brown emphasized multiple times that accessing the information on the

backup tapes would solve the spoliation problem facing the court.  (*See id.* at 38 ("And

the answer is lying right under our noses.  We brought it up in April.  We can go get

those tapes.  If there is something supposedly in Michelle Paulino's mailbox, we can look

at it. . . . We can do that.  A thousand dollars a day and it is here and we are done."); *id.*

at 27 ("THE COURT:  Is it your position, sir, that that is not an intentional deletion of

information once you are on notice of litigation?  MR. BROWN:  Your Honor, number

one, that is my position, because the emails exist on the backup tapes.  And we can get

them."); *id.* at 20 ("I know those things are still there.  I can tell you, it is about a

thousand dollars per day of recovery time.  It can be done.  It is sitting there."))

     Mr. Brown represented that the cost of retrieval would not be as excessive as the

court feared:  it was possible to recover all employee emails that predated a certain date

because the backup tapes stored nightly snapshots of the state of the system.  (*See id.* at

38-39.)  Specifically, Mr. Brown engaged in the following dialogue with the court:

> THE COURT:   You are sitting here telling me over and over and over again, we have the backup tapes, it solves the entire problem.  I don't know if we can go back to 2004, but that would be, what, 365 days a year times ten years at $1,000. . . .  Corinthian is going to have a very large bill.
>
> MR. BROWN:  The one day is a snapshot, though.  For example, if you asked how would the world be different if we had sent a litigation hold that stopped the deletion of one of the plaintiffs' emails, all we need—you can look at the termination date and get the backup tape for that date, and now you have got their email box exactly how it existed as of the date of their termination.  *It would be perfect. It would be one day, $1,000.*  If you wanted that for ten employees, then you get to $10,000. You don't have to do it as separate days, because it is cumulative.
>
> THE COURT:   I think what I want it for, sir, is every employee of Corinthian, because I have no confidence in your search. . . .
>
> MR. BROWN: . . . With respect to every employee, if you are looking at every employee at the Bremerton campus where this occurred, we can do that, your Honor. It can be done. We are not going to have to pay individually for each employee. If the backup tape for one day—That is across the whole campus. We can capture everybody that way. . . .

(*Id.* (emphasis added).)

Crediting Mr. Brown's representations that recovering data from the backup tapes

"would be perfect.  It would be one day, $1000[,]" the court deferred ruling on Plaintiffs'

motion and instead issued an order compelling production from the backup tapes. (*See*

Order Compelling Prod. (Dkt. # 49).)  The order required Corinthian to "retrieve from the

backup tapes all employee email accounts as they existed on or near the date that the last

Plaintiff's employment was terminated" and to "search the retrieved information

according to the terms articulated in the parties' stipulated order."  (*Id.* at 4.)  Because the

1  parties' trial date of January 6, 2014, was looming in less than one month, the court set a

2  deadline of December 20, 2013.  (*Id.* (requiring production by December 20, 2013).)

3       At the pretrial conference on Wednesday, December 18, 2013, Mr. Brown

4  represented that Corinthian had hired an outside vendor, had begun retrieving the emails

5  corresponding to the date of April 27, 2012, and would "ship what we can on Friday."

6  (PTC Trans. (Dkt. # 61) at 28-29.)  The very next day, however, Mr. Ruiz called to

7  inform the court that Corinthian would not be able meet the Friday deadline.  Mr. Ruiz

8  stated that the vendor believed it would take at least 12 more days to retrieve the data.  At

9  a telephone conference with the parties on December 23, 2013, Mr. Brown stated that the

10 document recovery could be completed, at the earliest, by December 31, 2013, but

11 declined to commit to a firm date.  (*See* Dkt. # 58; Enslow Decl. (Dkt. # 64) ¶ 4.)  The

12 following day, Plaintiffs agreed to vacate the parties' January trial date.  (*See id.*)

13      On January 2, 2014, Corinthian filed a status report indicating that it could not

14 produce the emails of four employees until January 6, 2014, and could not produce the

15 emails of three other employees until January 13, 2014.  (1st Status Rep. (Dkt. # 59) at 2-

16 3; *see also* Enslow Decl. ¶¶ 6, 7.)  During a telephone conference on January 13, 2014,

17 Corinthian's counsel represented that Corinthian would produce emails from all other

18 employees by January 27, 2014.[3]  (Enslow Decl. ¶ 8; Brown Decl. ¶ 8.)  Corinthian

19

20    [3] Despite the plain language of the court's order, which required Corinthian to "retrieve from the backup tapes *all employee email accounts*" and to "search the retrieved information according to the
21 terms articulated in the parties' stipulated order," (Order Compelling Prod. at 4 (emphasis added)), Mr. Brown argued that Corinthian was not required to produce any more emails.  (Enslow Decl. ¶ 8.)
22 Plaintiffs disagreed and Mr. Brown eventually agreed to produce the remaining emails.  (*Id.*)

1    missed this deadline; the remaining emails were not produced until February 10, 2014.

2    (Brown Decl. ¶¶ 9-10; *see also* 2/3/14 Min. Ord. (Dkt. # 65).)

3            All in all, Corinthian eventually produced about 3000 additional emails from the

4    backup tapes.  (Brown Decl. ¶¶ 8, 11; Enslow Decl. ¶¶ 6, 7.)  By comparison,

5    Corinthian's original entire discovery production up to that point encompassed only 110

6    email strings and 1270 pages of other documents.  (2d Resp. (Dkt. # 66) at 8 n.5 (citing

7    Ruiz Decl. ¶¶ 8-13).)  Corinthian finished production of the emails more than seven

8    weeks after the court's original deadline.[4]  (*See* Brown Decl. ¶¶ 9-10; Order Compelling

9    Prod. at 4.)

10           It cost Corinthian $7530.00 in vendor fees to recover the emails.  (*See* Tetzlaff

11    Decl. (Dkt. # 70) ¶ 30, Ex. N.)  Corinthian also claims to have incurred the "cost-

12    equivalent" of approximately $11,600.00 in employee time dedicated to restoring the

13    backup tapes (*see id.* ¶ 31), but provides no documentation to substantiate that claim.

14           Due to the volume of new documents produced, the court reopened discovery and

15    rescheduled trial at the end of the court's trial calendar for November 3, 2014.  (2/3/14

16    Min. Order; *compare* Sched. Order I (Dkt. # 11) *with* Sched. Ord. II (Dkt. # 74).)

17    Plaintiffs now bring a second motion for sanctions; this motion is predicated on the same

18    _____

19           [4] The recovery process proved considerably less straightforward than Mr. Brown represented at
oral argument.  The first vendor Corinthian hired was unable to retrieve any information from the backup
20    tapes.  (*See* Burkhart Decl. (Dkt. # 68); Tetzlaff Decl. (Dkt. # 70).)  The tapes were returned to
Corinthian, who managed to recover and produce some emails itself.  (*See* Tetzlaff Decl.; Banash Decl.
21    (Dkt. # 71).)  Corinthian then hired a second vendor to complete recovery of the emails; after some delay,
this vendor was able to retrieve only a subset of the remaining emails.  (*See id.*; Morgan Decl.  (Dkt. #
22    69).)  The tapes were once again returned to Corinthian, who eventually recovered and produced the final
subset of emails.  (*See* Tetzlaff Decl.; Banash Decl.; Brown Decl.)

1   facts as Plaintiffs' first motion, as well as on Corinthian's actions in the interim.  (*See*

2   *generally* 2d Mot.)  The court heard oral argument on this motion on March 21, 2014.

3   (*See generally* 3/21/14 Trans. (Dkt. # 77).)

4                               **III.    ANALYSIS**

5   **A.    Legal Standard:  Discovery Sanctions**

6         **1. Inherent Power**

7         Courts are invested with inherent powers that are "governed not by rule or statute

8   but by the control necessarily vested in courts to manage their own affairs so as to

9   achieve the orderly and expeditious disposition of cases."  *Chambers v. NASCO, Inc.*, 501

10  U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)).  The

11  Ninth Circuit "has recognized as part of a district court's inherent powers the broad

12  discretion to make discovery and evidentiary rulings conducive to the conduct of a fair

13  and orderly trial."  *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d

14  363, 368 (9th Cir. 1992).  Additionally, a district court "has the inherent authority to

15  impose sanctions for bad faith, which includes a broad range of willful improper

16  conduct."  *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001).

17         Sanctions issued under a court's inherent power against a party or party's attorney

18  "are available if the court specifically finds bad faith or conduct tantamount to bad faith."

19  *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107-08 (9th Cir. 2002) (quoting *Fink*, 239

20  F.3d at 994).  Bad faith is demonstrated by "delaying or disrupting the litigation or

21  hampering enforcement of a court order."  *Id.* (quoting *Hutto v. Finney*, 437 U.S. 678,

22  689 n.14 (1978)).  Conduct "tantamount to bad faith" includes "a variety of types of

ORDER- 13

1   willful actions, including recklessness when combined with an additional factor such as

2   frivolousness, harassment, or an improper purpose." *Id.* (quoting *Fink*, 239 F.3d at 994).

3       Although the Ninth Circuit has declined to decide the precise standard of proof for

4   sanctions awards, it is clear that a bad faith finding supported by clear and convincing

5   evidence will suffice. *See Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d

6   1216, 1219 (9th Cir. 2010) (declining to resolve burden of proof issue because clear and

7   convincing evidence supported the district court's bad faith finding); *In re Lehtinen* 564

8   F.3d 1052, 1061 n.4 (9th Cir. 2009) (same); *Fink*, 239 F.3d at 989 (same).  Upon a

9   finding of bad faith, courts can levy an assortment of sanctions under their inherent

10  power, including monetary awards, attorneys' fees, adverse inference jury instructions,

11  and even dismissal of claims. *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 881 F. Supp. 2d

12  1132, 1135 (N.D. Cal. 2012) (collecting cases); *see also Chambers v. NASCO, Inc.*, 501

13  U.S. 32, 43 (1991).  Sanctions may extend to both parties and counsel.  *See, e.g.*, *Barnd v.*

14  *City of Tacoma*, 664 F.2d 1339, 1342 (9th Cir. 1982) ("A trial court's inherent powers

15  unquestionably include the power to assess attorney's fees against any counsel who

16  willfully abuses judicial process or otherwise conducts litigation in bad faith."); *Primus*

17  *Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (reviewing district

18  court's sanction of attorney under inherent powers); *Tuttle v. Combined Ins. Co.*, 222

19  F.R.D. 424, 432 (E.D. Cal. 2004) (imposing $5000.00 fine against attorney).

20      **2.  Spoliation of Evidence**

21      Spoliation of evidence falls within the court's inherent power to sanction.  *Glover*

22  *v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) ("A federal trial court has the inherent

1  discretionary power to make appropriate evidentiary rulings in response to the destruction

2  or spoliation of relevant evidence.")  Spoliation of evidence is the "failure to preserve

3  property for another's use as evidence, in pending or future litigation." *Kearney v. Foley*

4  *& Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009).  A party's "duty to preserve evidence

5  is triggered when a party knows or reasonably should know that the evidence may be

6  relevant to pending or future litigation." *E.E.O.C. v. Fry's Elecs., Inc.*, 874 F. Supp. 2d

7  1042, 1044 (W.D. Wash. 2012); *see also Leon v. IDX Sys. Corp.*, C03-1158 P, 2004 WL

8  5571412, at *3 (W.D. Wash. Sept. 30, 2004) *aff'd*, 464 F.3d 951 (9th Cir. 2006).  Once

9  triggered, this duty extends to any documents or tangible items that the party knows or

10  should know are relevant to the litigation, as well as to documents in the possession of

11  employees who are "key players" in the case.  *Apple*, 881 F. Supp. 2d at 1137 (citing

12  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)).  If a company

13  has a document retention policy, the company is obligated to suspend that policy and

14  implement a litigation hold to ensure the preservation of relevant documents.  *Apple*, 881

15  F. Supp. 2d at 1137 (imposing sanctions for failure to institute litigation hold); *see, e.g.*,

16  *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) (same).

17      In the context of spoliation of evidence, the Ninth Circuit has "confirmed the

18  power of the district court to sanction under its inherent powers not only for bad faith, but

19  also for willfulness or fault by the offending party.  *Unigard*, 982 F.2d at 371; *see also*

20  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006).  A party's failure to preserve

21  evidence "qualifies as willful spoliation if the party has some notice that the documents

22  were *potentially* relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at

1   959 (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir.

2   2002)); *see also In re Napster*, 462 F. Supp. 2d at 1066 ("District courts may impose

3   sanctions against a party that merely had notice that the destroyed evidence was

4   potentially relevant to litigation.")  "In the Ninth Circuit, spoliation of evidence raises a

5   presumption that the destroyed evidence goes to the merits of the case, and further, that

6   such evidence was adverse to the party that destroyed it."  *Apple*, 888 F. Supp. at 993.

7        Counsel bear responsibility for coordinating their clients' discovery production.

8   *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("Counsel

9   must take affirmative steps to monitor compliance so that all sources of discoverable

10  information are identified and searched.")  As such, counsel's failure to oversee a client's

11  discovery efforts may merit sanctions.  *See, e.g.*, *Qualcomm Inc. v. Broadcom Corp.*,

12  05CV1958-B (BLM), 2008 WL 66932 (S.D. Cal. Jan. 7, 2008) *vacated in part*,

13  05CV1958-RMB (BLM), 2008 WL 638108 (S.D. Cal. Mar. 5, 2008) (sanctioning

14  attorneys because they "did not conduct a reasonable inquiry into the adequacy of [their

15  client's] document search and production and, accordingly, they are responsible, along

16  with [their client] for the monumental discovery violation"); *R & R Sails Inc. v. Ins. Co.

17  of State of Pa.*, 251 F.R.D. 520, 528 (S.D. Cal. 2008) (imposing sanctions against

18  attorney for "failure to search for and timely produce electronically-stored information").

19  **B.   Bad Faith**

20       The court finds that there is clear and convincing evidence showing that

21  Corinthian and Corinthian's counsel at Payne & Fears have refused to participate

22  forthrightly in the discovery process and that this refusal constitutes or is tantamount to

ORDER- 16

1   bad faith.  Corinthian's and Corinthian's counsel's discovery tactics, which are detailed

2   in the following paragraphs, have delayed resolution of Plaintiffs' claims, expended both

3   the court's and Plaintiffs' limited resources on matters ancillary to the merits, and

4   threatened to interfere with the rightful decision of this case.  Therefore, sanctions are

5   warranted.

6          To begin, there is no dispute that Corinthian did not issue a litigation hold in this

7   case.  (*See* Banash Dep. at 15; 12/12/13 Trans. at 4-5 (Mr. Brown testifying).)  Corinthian

8   has issued litigation holds in previous actions.  (*Id.*)  Nonetheless, for this case,

9   Corinthian only requested that a subset of employees, whom it deemed to be "key"

10  witnesses, search for and save relevant documents.  (*Id.* at 5-7, 12, 18; Ruiz Dec. ¶ 7-8.)

11  Testimony by some of these "key" witnesses, however, casts doubt on Corinthian's claim

12  that these employees in fact performed any—let alone a thorough—search for relevant

13  documents.  Specifically, Ms. Austin and Ms. Paulino testified that they did not search

14  for documents relevant to the litigation, and Ms. Givens and Ms. Phillips testified that

15  they did not recall searching for documents.[5]  (*See* Martin Decl. Ex. E ("Austin Dep.") at

16  3, Ex. F ("Givens Dep.") at 7, Ex. I ("Phillips Dep.") at 12, Ex. J ("Paulino Dep.") at 16.)

17  Such self-selection of a limited pool of discovery materials, combined with doubt as to

18  what searches, if any, were performed of this pool of materials, gives the court no

19  confidence in the quality of Corinthian's discovery production.  Yet, due to the lack of a

20

21          _____

22      [5] Two of these employees later impeached themselves in declarations responding to Plaintiffs'
first motion for sanctions; these employees claim that they now remember searching for documents.  (*See*
Austin Decl. (Dkt # 39-13); Givens Decl. (Dkt. # 39-9).)

ORDER- 17

1    litigation hold, it is not clear that the current additional discovery period, instituted 18

2    months after Plaintiffs filed suit, can remedy this deficiency.

3           Second, there is no dispute that Corinthian deleted Plaintiffs' email accounts, and

4    that the deletion of at least two of the accounts occurred after Corinthian's duty to

5    preserve documents was triggered.  Corinthian received EEOC notices on behalf of Ms.

6    Holland and Ms. Knickerbocker on May 4, 2012.  (Hainley Decl. ¶¶ 6, 7.)  These

7    documents put Corinthian on notice that Plaintiffs' emails may be relevant to potential

8    future litigation.  *See Fry's Elecs.*, 874 F. Supp. 2d at 1044.  Corinthian's IT Department

9    received Ms. Holland's and Ms. Knickerbocker's termination notices on April 26, 2012,

10   and April 30, 2012, respectively.  (Ainsworth Decl. ¶¶ 3-6; Hainley Decl. ¶¶ 4-9.)  The IT

11   Department closes a terminated employee's email account and slates it for deletion within

12   24 hours of receiving a termination notice; the system automatically deletes the account

13   30 days later.  (12/12/13 Trans. at 9, 29-30 (Mr. Banash testifying).)  As such—and as

14   Corinthian's counsel conceded at oral argument—the email account deletions occurred in

15   violation of Corinthian's duty to preserve evidence.  (*See id.* at 26 (Mr. Brown

16   speaking).)  Under the controlling caselaw outlined above, this situation, without more,

17   would qualify as willful spoliation of evidence that merits sanctions.  *See, e.g.*, *Apple*,

18   881 F. Supp. 2d at 1137; *In re Napster*, 462 F. Supp. 2d at 1070; *Leon*, 464 F.3d at 959.

19          Furthermore, with respect to the timing of the deletion of email accounts,

20   Corinthian's attempt to muddy the waters with Mr. Ainsworth's declaration is not well-

21   taken.  Corinthian has provided no justifiable reason why, in the face of contrary

22   testimony from its own Rule 30(b)(6) witness, the Senior Information Technology

ORDER- 18

1  Director of Information Security, Corinthian relied on technical advice from an

2  admittedly less-knowledgeable source, its own Corporate Counsel.  In Mr. Banash's own

3  words, he is more familiar with the email system than is Mr. Ainsworth (12/12/13 Trans.

4  at 29); Mr. Ainsworth even admitted that he was not sure when he made the declaration

5  that the information he was providing was correct (*id.* at 33).  Yet Mr. Ainsworth made

6  no effort to contact Mr. Banash until the eve of oral argument on Plaintiff's first motion

7  for sanctions.  (*Id.* at 33-34.)  Corinthian's attempt to to influence (if not misdirect) the

8  court with such unsubstantiated information falls below acceptable standards of

9  professional conduct.

10        Corinthian argues that, at least with respect to emails, no spoliation has occurred

11  because Corinthian has since recovered and produced all responsive employee emails

12  from the backup tapes.  The court notes that this argument contravenes what appears to

13  have been Corinthian's previous position that the backup tapes were not reasonably

14  accessible.[6]  Corinthian's characterization of the backup tapes has shifted with the winds

15  throughout this litigation, adopting whatever posture is most convenient in the immediate

16  _____

17        [6] Under Rule 26(b)(2)(B):  "A party need not provide discovery of electronically stored
    information from sources that the party identifies as not reasonably accessible because of undue burden
18  and cost."  Fed. R. Civ. P. 26(b)(2)(B).  The appropriate context for determining the accessibility of the
    information on Corinthian's backup tapes would have been in a motion to compel.  *See* Fed. R. Civ. P.
    26(b)(2)(B) Advisory Committee Notes, 2006 Amendments; *see also Mikron Indus., Inc. v. Hurd*
19  *Windows & Doors, Inc.*, No. C07-532RSL, 2008 WL 1805727 (W.D. Wash. Apr. 21, 2008) (evaluating
    motion to compel under Rule 26(b)(2)(B)).  In such a motion, Corinthian would bear the burden to show
20  that accessing the tape would be unduly costly, and Plaintiffs would bear the burden to show good cause
    for allowing discovery—specifically, that Plaintiffs' need for the information on the backup tapes
    outweighed the costs.  *Id.*  Inasmuch as (1) Corinthian dodged Plaintiffs' motion to compel with an
21  ambiguously worded and now-contested stipulation (*see* Stip. Order), (2) the parties continue dispute to
    what extent Plaintiffs were apprised of the nature of the backup tapes, (*see* 1st Reply (Dkt. # 40) at 5-6),
    and (3) Corinthian's counsel never set forth a clear picture of the process of retrieving information from
22  the tapes, this option was not available to the court.

context.  (*Compare* Ruiz Decl. ¶ 17 ("I explained that it was unreasonable and

impractical to search them . . . .") *with* 12/12/13 Trans. ("It would be perfect. It would be

one day, $1,000.") (Mr. Brown testifying).)  Corinthian cannot have it both ways.  If the

information on the backup tapes was unavailable within the meaning of Federal Rule of

Civil Procedure 26(b)(2)(B) such that Corinthian was not required to recover it, then the

Plaintiffs' deleted emails were, in fact, spoliated evidence.  If, as Corinthian's counsel

represented at oral argument, the information on the backup tapes was accessible, then

Corinthian had little basis for refusing to search the backup tapes under the parties'

Stipulated Order, no basis for filing a verification with the court affirming that it had

searched "all available electronic sources" (*see* Verification at 3), and appears to have

assumed a misleading stance with Plaintiffs from the beginning.

Corinthian counters that it encountered substantial technical difficulties and costs

in retrieving the emails from the backup tapes.  (*See* Tetzlaff Decl.)  But any obstacles

Corinthian faced in recovering the emails were the direct result of Corinthian's

inadequate discovery search, deletion of evidence, and lack of candor with both Plaintiffs

and with the court.  Such obstacles do not transform bad faith into good.

Throughout the course of the litigation, Corinthian did not once provide a straight-

forward explanation of the process and cost of extracting information from the tapes.  Mr.

Ruiz originally estimated that recovery of deleted emails "would take at least three days

and could cost thousands of dollars."  (Ruiz 2d. Decl. (Dkt. # 67) ¶ 6.)  Yet during

discovery, Plaintiffs remained unaware that Corinthian's backup system differentiated

between backup tapes and backup servers, and that Corinthian interpreted the parties'

1  Stipulated Order as excluding backup tapes.  (12/12/13 Trans. at 22-25, 31-32 (Ms.

2  Enslow testifying) ("No, your Honor, I did not understand the distinction between backup

3  tapes and backup servers, and Mr. Ruiz never offered his understanding of the distinction

4  of those words.")  Corinthian's Rule 30(b)(6) witness did nothing to clear up the

5  confusion, despite notice that he was expected to testify on the topic of backup sources.

6  (*See* Banash Dep. at 9-10; 30(b)(6) Not.)  As a result, even as of the first motion for

7  sanctions, Plaintiffs were uncertain as to the function of the backup tapes and remained

8  under the impression that recovery was not an option.  (*See* 12/12/13 Trans. at 23; 1st

9  Reply (Dkt. # 40) at 5 n.4 ("[D]efense counsel suggested that disaster recovery was only

10  available in the event of a catastrophe and was not an option here."))

11      During the first hearing on sanctions, however, Corinthian's counsel switched

12  tacks.  In an effort to avoid sanctions for spoliating evidence, Corinthian's counsel

13  painted a particularly optimistic picture of Corinthian's ability to recover information

14  from the backup tapes.  (*See id.* at 17, 20, 27, 38-39 ("And the answer is lying right under

15  our noses. . . .  We can go get those tapes. . . .  A thousand dollars a day and it is here

16  and we are done."))  But this testimony quickly proved to be incorrect.  Once Corinthian

17  set about retrieving the emails, it consistently failed to meet deadlines—even deadlines

18  that Corinthian imposed on itself and assured the court it could meet.  (*See* Order

19  Compelling Prod. at 4 (December 20, 2013 deadline); PTC Trans. at 28 (same); Enslow

20  Decl. ¶ 4 (December 31, 2013, deadline); 1st Status Rep. at 2 (January 6 and January 13,

21  2014, deadlines); Enslow Decl. ¶ 8 (January 27, 2014 deadline); Brown Decl. ¶¶ 9-10

22  (final production on February 10, 2014).)  In light of these facts, the court disagrees that

1    the effort Corinthian expended in attempting to remedy its prior improper discovery

2    behavior in any way excuses or mitigates that behavior.  After all, such effort came only

3    as a result of a court order—a court order that relied on Corinthian's counsel's

4    representations in open court.

5           In sum, the court finds, by clear and  convincing evidence, that Corinthian's and

6    Corinthian's counsel's lackluster search for documents, failure to implement a litigation

7    hold, deletion of evidence, refusal to cooperate with Plaintiffs in the discovery process

8    (particularly as evidenced by its withholding of information regarding both the backup

9    tapes and its interpretation of the parties' Stipulated Order), reliance on a recklessly false

10   declaration, shifting litigation positions, and inaccurate representations to the court

11   constitute bad faith or conduct tantamount to bad faith.

12   **C.    Sanctions**

13          Sanctions should be commensurate to the sanctioned party's degree of fault and

14   the other party's prejudice.  *See Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No.

15   CIV. 10-0541-GPC WVG, 2013 WL 6159177, at *7 (S.D. Cal. Nov. 25, 2013); *Leon*,

16   2004 WL 5571412, at *5; *In re Napster*, 462 F. Supp. 2d at 1066.  Accordingly, although

17   the cost of retrieving emails from the backup tapes does not affect the question of

18   whether sanctions are warranted, the court will bear the cost in mind when assessing the

19   appropriate level of sanctions.  Plaintiffs ask for a host of sanctions against Corinthian,

20   only some of which are appropriate here.

21          First, there is no basis for a jury instruction that Corinthian intentionally destroyed

22   documents that were presumably damaging to Corinthian.  (*See* 2d. Mot. at 11-12.)  The

1   recovery of employee emails from the backup tapes has likely avoided spoliation of email

2   evidence.  Because no litigation hold was implemented, it is possible that other

3   documentary evidence overlooked by Corinthian's initial self-selected search may have

4   been lost over time.  However, mere possibility cannot be the basis for an adverse jury

5   instruction.  At this time, Plaintiffs have simply not shown a reason to believe additional

6   categories of documents have been destroyed.

7          The court requested supplemental briefing from the parties regarding any allegedly

8   spoliated documentary evidence.  (*See* Plf. Surreply (Dkt. # 78); Def. Surreply (Dkt.

9   # 81).)  Plaintiffs have identified certain categories of documents it believes are missing,

10  none of which merit an evidentiary sanction.  (*See* Plf. Surreply.)   To begin, the

11  handwritten interview notes taken by Pamela Hainley and Jenna Rygol have already been

12  produced—albeit belatedly—by Corinthian.  (*See* Interview Notes (Dkt. ## 79-1, 79-2).)

13  The fact that the interview notes were not produced until January 13, 2014—months after

14  Ms. Hainley and Ms. Rygol mentioned the notes in their depositions and one week after

15  the trial was scheduled to begin—highlights the inadequacy of Corinthian's initial search

16  for and production of documents.  (*See* 3/21/14 Trans. at 26 (testimony by Corinthian

17  attorney Mr. Brown:  "I'm going to do a mea culpa on the timing.  They were produced

18  on January 13, 2014."))  But produced documents cannot form the basis for a spoliation

19  instruction.

20         Plaintiffs also speculate—but provide zero evidence—that certain other categories

21  of documents are missing.  Specifically, Plaintiffs argue that Corinthian never produced

22  hard copy documents and computer files maintained in Ms. O'Connell's office, but fail to

1    provide a declaration or other evidence showing that these documents in fact existed.

2    (*See* Plf. Surreply; *see generally* Enslow Decl. II Exs. A-J (Dkt. # 79-1 to 79-4).)  This

3    omission is particularly glaring given that Ms. O'Connell is one of the Plaintiffs in this

4    case.  Similarly, Plaintiffs fail to provide any evidence that text messages from Ms. Rygol

5    regarding the events at issue in this case ever existed.  (*Id.*)  The court cannot base an

6    evidentiary sanction on this record.

7         The remaining categories of allegedly missing documents identified by Plaintiffs

8    are supported only by tenuous evidence of existence and appear to be marginally relevant

9    to the issues in this case.  (*See, e.g.*, Plf. Surreply (discussing meeting minutes regarding

10   the "Dream Award selection process" that Ms. Holland believed another employee

11   wrote).)  In light of these facts, the court finds that a jury instruction that Corinthian

12   destroyed documents beneficial to Plaintiffs' case would be too strong a thumb on the

13   scales of justice.  Plaintiffs have not shown that an evidentiary sanction is warranted.

14        Second, the court denies Plaintiffs' request that Corinthian be prevented from

15   using any documents produced on or after January 6, 2014.  (2d Mot. at 12.)  Plaintiffs

16   rely on Federal Rule of Civil Procedure 37 for this request, but this Rule is inapplicable

17   to the court's holding today.  There is no basis for excluding relevant evidence from the

18   case, especially given that discovery was reopened after that evidence was produced.

19   This case will be tried on its merits.

20        Third, Plaintiffs are entitled to attorneys' fees.  It is well-established that a district

21   court may award sanctions in the form of attorneys' fees against a party who acts in bad

22   faith.  *See, e.g.*, *Barnd*, 664 F.2d at 1342; *Primus,* 115 F.3d at 648; *Roadway Exp., Inc. v.*

1  *Piper*, 447 U.S. 752, 767 (1980).  As such, the court awards Plaintiffs the costs and

2  attorneys' fees incurred due to Corinthian's bad faith discovery practices.  Plaintiffs may

3  recoup costs and fees associated with their first and second motions for sanctions, as well

4  as costs and fees of duplicative discovery reasonably attributable to Corinthian's

5  sanctioned conduct.  At the close of the second discovery period, Plaintiffs shall file a

6  separate motion detailing their requested fees for the court's consideration.

7       Finally, the court imposes fines against Corinthian and Corinthian's counsel,

8  Payne & Fears.  A court may fine a party or an attorney in order to, among other things,

9  "offset the excess costs caused by [the party's] discovery violations, to punish

10  unacceptable behavior, and as a deterrent to future bad conduct."  *E.E.O.C. v. Fry's*

11  *Electronics, Inc.*, 287 F.R.D. 655, 660 (W.D. Wash. 2012) (imposing fines of $75,000.00

12  payable to plaintiffs and $25,000.00 payable to the court); *see also Tuttle*, 222 F.R.D. at

13  432 (imposing $5000.00 fines each against attorney and party for causing a witness to be

14  unavailable in the hopes that "sanctions will cause counsel to evaluate their standards of

15  professional conduct and hopefully modify their future behavior").  Here, Corinthian's

16  bad faith discovery conduct has delayed the parties' trial date by almost one year, wasted

17  the court's and Plaintiffs' trial preparations, required the court to engage in numerous

18  hearings and status conferences, resulted in more documents being produced after the

19  original scheduled trial date than during discovery itself, and threatened to interfere with

20  the rightful decision of this case.  *See Kamatani v. Benq Corp.*, CIV.A. 2:03-CV-437,

21  2005 WL 2455825 (E.D. Tex. Oct. 4, 2005) (imposing sanctions of $500,000.00 against

22  party for discovery violations).  The conduct of Corinthian's counsel at Payne & Fears,

1  namely, Mr. Brown and Mr. Ruiz, has substantially contributed to these adverse

2  consequences.  *See R & R Sails*, 251 F.R.D. at 528; *Qualcomm*, 2008 WL 66932, at *12-

3  14; *Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 294 (5th Cir. 1997)

4  (affirming imposition of $7000.00 fine against attorney); *Kleiner v. First Nat. Bank of*

5  *Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985) (affirming imposition of $50,000.00 fine

6  against attorney).  Accordingly, the court imposes a fine of $25,000.00, payable to the

7  court, against Corinthian, and a separate fine of $10,000.00, payable to the court, against

8  Payne & Fears.[7]

9  //

10 //

11 //

12 //

13 //

14 //

15 //

16 //

17 //

18 //

19 _____

20  [7] In assessing these sanctions, the court is mindful of the principles outlined in *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1138 (9th Cir. 2001).  The court has

21  tailored both the sanctions imposed and the procedures followed with the object of conforming to those teachings.  Accordingly, Corinthian and its attorneys have been given multiple opportunities to present

22  their case to the court, including two rounds of briefing, an evidentiary hearing, and oral argument.

ORDER- 26

# IV.     CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiffs' motions for sanctions (Dkt. # 37, Dkt. # 63).  Plaintiffs shall bring a separate motion for attorneys' fees. Corinthian Colleges, Inc. shall, within ten days of this order, pay $25,000.00 to the Clerk of Court.  Corinthian's counsel, Payne & Fears LLP, shall, within ten days of this order, pay $10,000.00 to the Clerk of Court.

Dated this 4th day of April, 2014.

JAMES L. ROBART
United States District Judge

ORDER- 27